**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DUVALL ESPRESSO IP ENFORCEMENT, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 24-22-CJB |
| METICULOUS HOME, INC. and JUAN CARLOS LOPEZ PENDAS, | ) ) ) | |
| Defendants. | ) ) | |

James D. Taylor, Jr. and Michelle C. Streifthau-Livizos, SAUL EWING, LLP, Wilmington, DE; Mark C. Johnson, JOHNSON DALAL, Plantation, FL, Attorneys for Plaintiff Duvall Espresso IP Enforcement, LLC.

Jennifer Ying, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Sarah E. Fowler, PERKINS COIE LLP, Palo Alto, CA; Matthew A. Lembo, PERKINS COIE LLP, New York, NY, Attorneys for Defendants Meticulous Home, Inc. and Juan Carlos Lopez Pendas.[1]

### MEMORANDUM OPINION

March 2, 2026
Wilmington, Delaware

---

[1]     Pursuant to the Court's custom, in this Memorandum Opinion resolving a potentially case-dispositive motion in a consent matter, the Court has listed in the caption the attorneys on the briefs for each side.  It notes, however, that subsequent to briefing, the Court granted Defendants' counsels' unopposed motion to withdraw as counsel in the case.  (D.I. 73)

*Christopher J. Burke*

**BURKE, United States Magistrate Judge**

Pending in this patent infringement case brought by Plaintiff Duvall Espresso IP Enforcement, LLC ("Plaintiff" or "Duvall") against Defendants Meticulous Home, Inc. ("Meticulous") and Juan Carlos Lopez Pendas ("Mr. Pendas" and collectively with Meticulous, "Defendants") is Defendants' motion to dismiss the operative First Amended Complaint ("FAC") against them, filed pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) (the "Motion"). (D.I. 44) For the reasons set forth below, the Court[2] GRANTS-IN-PART and DENIES-IN-PART the Motion.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    The Parties

Duvall is a Florida limited liability company with its principal place of business in Palm Beach County, Florida. (D.I. 43 at ¶ 3) Duvall is owned and operated by Duvall Espresso, Inc. ("Duvall Espresso"); Duvall Espresso is a Delaware corporation that operates as a foreign entity in Georgia, where Duvall Espresso has its principal place of business. (*Id.* at ¶ 4) Duvall Espresso commercially develops, markets and sells espresso-related and coffee-related products. (*Id.* at ¶ 40) The principal officer and owner of Duvall Espresso is Gideon Duvall ("Mr. Duvall"). (*Id.* at ¶ 5)

Meticulous is a Delaware corporation. (*Id.* at ¶ 6) Mr. Pendas founded Meticulous, and he is its sole owner and decision maker. (*Id.* at ¶¶ 7, 17, 34) Mr. Pendas is a resident of Puebla, Mexico. (*Id.* at ¶ 34)

---

[2]    On February 16, 2024, the parties jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 38)

### 2.    The Asserted Patents

Mr. Duvall was the original recipient and owner of United States Patents Nos. 10,349,774 (the "'774 patent"), 10,258,187 (the "'187 patent") and 9,867,491 (the "'491 patent" and collectively with the '774 patent and '187 patent, the "asserted patents"). (*Id.* at ¶ 44) Before this lawsuit was filed, the asserted patents were assigned to Duvall. (*Id.* at ¶ 45) The '774 patent is entitled "Device and System for Creating Infused Beverages" and it issued on July 16, 2019. ('774 patent at 1)[3] The claims of the '774 patent recite devices and systems for creating infused beverages. (*See* D.I. 43 at ¶ 46) The '187 and '491 patents are both entitled "Device and System for Brewing Infused Beverages[;]" the '187 patent issued on April 16, 2019, and the '491 patent issued on January 16, 2018. ('187 patent at 1; '491 patent at 1) The claims of the '187 and '491 patents recite an infused beverage brewing assembly and method. (*See* D.I. 43 at ¶¶ 52, 54, 55)[4]

### 3.    The Alleged Infringement

The FAC alleges that since at least February 2023, Meticulous has marketed and sold electric coffee and espresso making machines (the "accused products") to consumers around the world, including in Delaware. (*Id.* at ¶ 9) More specifically, the FAC alleges that Meticulous filed a federal trademark application on May 3, 2022 with the United States Patent and Trademark Office ("USPTO") for the trademark "Meticulous" and for the goods "Electric Coffee Makers." (*Id.* at ¶ 10) On August 21, 2023, a "Statement of Use" was filed with respect to the application in which Mr. Pendas declared that the Meticulous mark was "in use in commerce on

---

[3]    The asserted patents are attached as exhibits to the FAC. (D.I. 43, exs. A-C) Herein, the Court will cite to the asserted patents by patent number.

[4]    In the FAC, Duvall asserts claims 1, 10, 19 and 20 of the '774 patent, claims 1, 8 and 16 of the '187 patent and claims 1, 7 and 17 of the '491 patent. (D.I. 43 at ¶¶ 46, 48, 52, 54, 55)

or in connection with . . . Electric coffee makers" (the "Statement of Use").  (*Id.* at ¶¶ 11-12)

The Statement of Use attached photographs showing the accused products in shipping boxes and

other displays, including at a public conference, and it indicated that the Meticulous mark was

first used with respect to the accused products on November 2, 2022 and was first used in federal

commerce in February 2023.  (*Id.* at ¶¶ 13-14 & ex. E)

Meticulous conducts business through websites that include the "Meticulous Website[,]"

the "Indiegogo Website" and the "Kickstarter Website[.]"  (*Id.* at ¶ 16)  The Meticulous Website

states that consumers can pre-order the accused products on the Indiegogo Website.  (*Id.* at ¶ 19)

As of March 21, 2024, the Indiegogo Website stated that Defendants have raised $6,058,108

United States dollars by "4,845 backers" in connection with pre-orders of the accused products.

(*Id.* at ¶¶ 20-21)  Defendants provide customers that pre-order the accused products with at least

32% off the sales price, which is $2,000.  (*Id.* at ¶ 22)  The FAC alleges that after a customer

pre-orders an accused product from the Indiegogo website, it is later shipped to the customer.

(*Id.* at ¶ 23)  The Indiegogo website also indicates that the accused products have been marketed

and advertised on "Sprudge," the "Spoon," "uncrate," "Hiconsumptions," "imboldn,"

"stuipiddope," "FHM" and "UrbanDaddy[.]"  (*Id.* at ¶ 24)

The Kickstarter Website also enables users to pre-order the accused products.  (*Id.* at ¶

26)  As of March 4, 2024, the Kickstarter Website stated that Defendants have raised $4,960,579

United States dollars by "3,774 backers" in connection with pre-orders of the accused products.

(*Id.* at ¶ 25)  The Kickstarter website stated that pre-ordered accused products were to ship in

December 2023.  (*Id.* at ¶ 27)

In April 2023, Mr. Duvall and Mr. Pendas were both in attendance at the Specialty

Coffee Expo ("SCA") in the United States.  (*Id.* at ¶ 29)  Mr. Pendas was advertising and

marketing the accused products to potential customers at the SCA. (*Id.*) Mr. Duvall informed

Mr. Pendas that the accused patents infringed several patents that Mr. Duvall owned. (*Id.* at ¶

30)

At Mr. Pendas' request, Mr. Duvall sent Defendants a notice of patent infringement on

June 22, 2023 which identified the '774 patent (the "notice letter"). (*Id.* at ¶¶ 30-31; *id.*, ex. D)

The notice letter was sent to Defendants at their Delaware mailing addresses in Middletown,

Delaware and Claymont, Delaware. (*Id.* at ¶ 31; *id.*, ex. D)

Additional relevant factual allegations will be discussed below in Section III.

### B.    Procedural Background

Duvall originally filed this action in the United States District Court for the Southern

District of Florida on October 11, 2023. (D.I. 1) Defendants moved to dismiss the case for, *inter

alia*, improper venue, (D.I. 16), and on January 9, 2024, the case was transferred to this District

pursuant to an agreement by the parties, (D.I. 25; D.I. 26). On March 25, 2024, Duvall filed the

operative FAC. (D.I. 43) The FAC alleges that Defendants directly, indirectly and willfully

infringe the asserted patents. (*Id.* at ¶¶ 63-65, 71-73, 79-81)

On April 8, 2024, Defendants filed the instant Motion, (D.I. 44), which was fully briefed

as of April 29, 2024, (D.I. 53). On July 3, 2024, Defendants submitted a notice of subsequent

authority. (D.I. 62)

Defendants also moved to stay the case pending resolution of the Motion. (D.I. 50) On

July 8, 2024, the Court ordered that the parties should proceed with certain initial deadlines such

as initial disclosures, the submission of a protective order and ESI order, and identification of the

accused products, but otherwise granted that motion, such that the case is currently stayed. (*See*

D.I. 66 at 45-47)

## II.     LEGAL STANDARDS

### A.     Rule 12(b)(2)

Rule 12(b)(2) directs courts to dismiss a case when the court lacks personal jurisdiction over the defendant.  Fed. R. Civ. P. 12(b)(2).  Determining the existence of personal jurisdiction consists of a two-part analysis.  *Power Integrations, Inc. v. BCD Semiconductor Corp.*, 547 F. Supp. 2d 365, 369 (D. Del. 2008).  First, the Court must consider whether a defendant's actions come within any of the provisions of Delaware's long-arm statute.  *See id.*; *Intel Corp. v. Broadcom Corp.*, 167 F. Supp. 2d 692, 700 (D. Del. 2001).  Second, the Court must determine whether exercising jurisdiction over the defendant in Delaware comports with the Due Process Clause of the United States Constitution.  *See Power Integrations*, 547 F. Supp. 2d at 369; *Intel*, 167 F. Supp. 2d at 700.  Due process is satisfied where the court finds that "certain minimum contacts" exist between the defendant and the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citations omitted).

With respect to the first-step statutory inquiry, the Court applies the law of the state in which the district court is located.  *See Power Integrations*, 547 F. Supp. 2d at 369.  For the second step due process analysis, the law of the United States Court of Appeals for the Federal Circuit applies.  *See Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1564 (Fed. Cir. 1994); *Power Integrations*, 547 F. Supp. 2d at 369.

Rule 8 does not require a plaintiff to set forth in the complaint "the grounds upon which the court has personal jurisdiction over the defendant."  *Hansen v. Neumueller GmbH*, 163 F.R.D. 471, 474 (D. Del. 1995).  However, when a defendant moves to dismiss a lawsuit for lack of personal jurisdiction, the plaintiff bears the burden of showing the basis for jurisdiction.

*Power Integrations*, 547 F. Supp. 2d at 369. In a case like this one, where a district court has not held an evidentiary hearing, the plaintiff must only make a *prima facie* showing that personal jurisdiction exists. *See Perlight Solar Co. Ltd. v. Perlight Sales N. Am. LLC*, C.A. No. 14-331-LPS, 2015 WL 5544966, at *2 (D. Del. Sept. 18, 2015); *Hardwire, LLC v. Zero Int'l, Inc*., Civil Action No. 14-54-LPS-CJB, 2014 WL 5144610, at *5 (D. Del. Oct. 14, 2014). To do so, the plaintiff must establish, with reasonable particularity, sufficient contacts between the defendant and the forum state. *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). All factual inferences to be drawn from the pleadings, affidavits and exhibits must be drawn in the plaintiff's favor at this stage. *Hardwire*, 2014 WL 5144610, at *5 (citing cases); *Power Integrations*, 547 F. Supp. 2d at 369.

## B.    Rule 12(b)(6)

The sufficiency of pleadings for non-fraud claims is governed by Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11 (citation omitted). Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).[5] "A claim has facial plausibility when the plaintiff

---

[5]    In resolving a motion to dismiss, a court typically considers the allegations in the complaint, the exhibits attached thereto, documents or facts that are incorporated by reference into the complaint or that are otherwise integral to the complaint's allegations, matters of public record and items for which the court can take judicial notice. *See Siwulec v. J.M. Adjustment Servs., LLC*, 465 F. App'x 200, 202 (3d Cir. 2012); *ING BANK, fsb v. PNC Fin. Servs. Grp., Inc.*, 629 F. Supp. 2d 351, 354 (D. Del. 2009).

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  In assessing the plausibility of a claim, the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210 (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

## III.   DISCUSSION

With their Motion, Defendants argue that the FAC must be dismissed as to them for several reasons.  As for the claims against Mr. Pendas, Defendants argue that:  (1) the FAC fails to state a claim of direct infringement against Mr. Pendas pursuant to Rule 12(b)(6), because it does not plead sufficient facts to pierce the corporate veil or plead any facts that make him personally liable for any infringement by Meticulous; and (2) Mr. Pendas should be dismissed for lack of personal jurisdiction pursuant to Rule 12(b)(2).  (D.I. 45 at 6-10; D.I. 53 at 1-4)  And as for the claims against both Defendants, Defendants argue that:  (1) the direct infringement claims fail for all asserted patents because Meticulous has never commercially launched a product anywhere, including in the United States; and (2) the indirect infringement claims for all asserted patents fail because they are barebones; and (3) all claims regarding the '187 and '491 patents should be dismissed because the FAC's allegations of direct infringement are entirely conclusory, and the FAC fails to plead that Defendants had knowledge of those patents as is required to support an allegation of indirect infringement or willfulness.  (D.I. 45 at 10-20; D.I. 53 at 4-10)  The Court takes up these (many) arguments in turn below.

### A.   Claims Against Mr. Pendas

#### 1.   Does the FAC Plead Sufficient Facts to Hold Mr. Pendas Personally Liable for Direct Infringement?

8

The Court first considers whether the FAC pleads sufficient facts to hold Mr. Pendas personally liable for direct infringement. The crux of Defendants' argument here is that in order to plausibly state a direct infringement claim against a corporate officer (such as Mr. Pendas), the patentee must either: (1) plead factual allegations sufficient to pierce the corporate veil; or (2) plead that Mr. Pendas personally engaged in patent infringement—separate and apart from anything Mr. Pendas did in his corporate capacity for Meticulous. (D.I. 45 at 6; D.I. 53 at 1) Duvall, for its part, argues that a corporate officer may be personally liable for direct infringement if the officer participated in the infringement, full stop—and that in such circumstances, the corporate veil need not be pierced. (D.I. 49 at 4) Nevertheless, Duvall also argues that the FAC's allegations sufficiently plead *both* that Mr. Pendas is the alter ego of Meticulous and that he personally engaged in infringement. (*Id.* at 4-5)

To resolve this dispute, the Court must first assess the relevant caselaw, which can be a little tricky, at least at first glance. Then it will turn to whether the FAC's allegations are sufficient.

### a.    Liability of Corporate Officers for Direct Infringement

After a careful review of the caselaw in this area, the Court agrees with Plaintiff that a corporate officer/owner may be personally liable for his own acts of direct infringement, even if he committed those acts as part of his work for the corporation. "Patent infringement is a tort[.]" *Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1313 (Fed. Cir. 2010) (citation omitted). And as a general matter, "[c]orporate officers can be personally liable for their own acts of infringement, even if those acts were committed in their corporate capacity." *Lubby Holdings LLC v. Chung*, 11 F.4th 1355, 1358 (Fed. Cir. 2021); *see also Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) ("A corporate officer is individually liable for

9

the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort.").[6]

Despite the existence of this otherwise apparently well-settled principle, certain Federal Circuit opinions issued over the last many decades used language that could suggest that a plaintiff must pierce the corporate veil in order to hold corporate officers personally liable for direct infringement. For example, in *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565 (Fed. Cir. 1986), the Federal Circuit recognized the general principle noted above that "officers of a corporation are personally liable for tortious conduct of the corporation if they personally took part in the commission of the tort or specifically directed other officers, agents, or employees of the corporation to commit the tortious act." 806 F.2d at 1579 (noting that "[t]he cases are legion in which courts have recognized and imposed personal liability on corporate officers for participating in, inducing, and approving acts of patent infringement") (citing cases). Yet in that same case, the Federal Circuit also stated that "[t]o determine whether corporate officers are personally liable for the direct infringement of the corporation under [35 U.S.C. §] 271(a) ["Section 271(a)"] requires invocation of those general principles relating to piercing the corporate veil." *Id.*[7]

_____

[6]    The Federal Circuit has applied its own law to assess the extent of a corporate officer/owner's liability for patent infringement. *See, e.g.*, *Lubby Holdings*, 11 F.4th at 1358. However, with respect to the application of the corporate veil doctrine in general, the Federal Circuit follows the law of the regional circuit, because that doctrine is not unique to patent law. *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1295 (Fed. Cir. 2007); *Pado, Inc. v. SG Trademark Holding Co.*, 537 F. Supp. 3d 414, 423 (E.D.N.Y. 2021).

[7]    In *Orthokinetics*, the plaintiffs marketed and sold a travel chair, and defendant Safety Travel Chairs, Inc. ("STC") began to sell similar chairs manufactured by Entron, Inc. ("Entron"). *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1569 (Fed. Cir. 1986). The jury had returned a verdict, *inter alia*, finding that the corporate officer defendants (Pivacek, Cole and Chipman) were personally liable for patent infringement. *Id.* at 1578. The

Federal Circuit decisions that followed tended to state that for corporate officers to be personally liable for a corporation's direct infringement, "there must be evidence to justify piercing the corporate veil." *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 552-53 (Fed. Cir. 1990) (reversing a district court's judgment finding that individual defendants were personally liable for direct infringement, where the acts at issue were "within the scope of their employment" and thus were protected by the corporate veil);[8] *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1331 (Fed. Cir. 1999) ("Personal liability under § 271(a), however, requires sufficient evidence to justify piercing the corporate veil."); *Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1314 (Fed. Cir. 2010) (stating that "the 'corporate veil' shields a company's officers from personal liability for direct infringement that the officers commit in the

---

district court subsequently granted a judgment notwithstanding the verdict ("JNOV"), finding that the corporate officer defendants were not personally liable. *Id.* at 1567, 1570.

The Federal Circuit reversed the JNOV in this regard, determining that Pivacek, Cole and Chipman were personally liable for direct infringement because the facts demonstrated that: (1) Pivacek was the President and sole stockholder of Entron and had selected its Board of Directors, and was President of STC; (2) Pivacek, Cole and Chipman held STC's directorships and owned all of its stock; (3) Pivacek, Cole and Chipman were directly responsible for the design and production of the accused products; and (4) Pivacek, Cole and Chipman "were the only ones who stood to benefit from sales of those chairs." *Id.* at 1579. It is not clear if the Federal Circuit's conclusion here was premised on piercing the corporate veil, as it did not explicitly mention that phrase in this portion of the opinion, nor did it there use the term "alter ego" (or cite to the relevant factors that apply to such an analysis). *Id.*; *see also Symbol Techs., Inc. v. Metrologic Instruments, Inc.*, 771 F. Supp. 1390, 1403 (D.N.J. 1991) (observing that the *Orthokinetics* Court's unsupported statement regarding piercing the corporate veil was dicta, as the Court's holding was not based upon piercing the corporate veil, and finding that "the long-established rule that a corporate officer can be liable for direct infringement without piercing the corporate veil remains in effect").

[8]      In support of the notion that patentees must pierce the corporate veil to hold corporate officers personally liable for direct infringement, the *Manville* Court cited only to *A. Stucki Co. v. Worthington Indus., Inc.*, 849 F.2d 593 (Fed. Cir. 1988). *Manville Sales Corp.*, 917 F.2d at 552. *A. Stucki* did not involve corporate officers at all, but instead concerned the liability of a parent corporation for the conduct of a corporate subsidiary. 849 F.2d at 594, 596.

name of the corporation, unless the corporation is the officers' 'alter ego[,]'" and finding that "[i]n this case, the jury's verdict of Khatemi and Assadian's individual liability, despite the lack of instructions on INSC's existence or piercing its corporate veil, was plain error that requires a new trial."). As a result of this line of cases, several district courts have required that a patentee pierce the corporate veil in order to hold corporate officers personally liable for direct infringement (i.e., in scenarios where those officers committed what would otherwise be an act of patent infringement in the course of their corporate employment). *See, e.g.*, *Cal. Expanded Metal Prods. Co. v. Klein*, 426 F. Supp. 3d 730, 753 n.10 & 755 (W.D. Wash. 2019) (rejecting the plaintiffs' argument that defendant's sole owner and officer could be held personally liable for patent infringement, where he was responsible for essentially all of the corporation's activities and authorized and directed the infringement, stating that "[u]nder Federal Circuit precedent, [p]laintiffs must instead establish circumstances that justify piercing Safti-Seal's corporate veil"); *see also MercAsia USA, Ltd. v. Jianqing Zhu*, Case No. 3:17-CV-718 JD, 2018 WL 3833520, at *2 (N.D. Ind. Aug. 13, 2018).

If Federal Circuit precedent regarding this issue ended there, perhaps the Court would fall in line with these district courts. However, more recently in *Lubby Holdings LLC v. Chung*, 11 F.4th 1355 (Fed. Cir. 2021), the Federal Circuit cleared things up.[9] In that case, the plaintiff

---

[9] The Court notes that even before *Lubby Holdings* issued, some district courts found that piercing the veil was not required in order to find corporate officers personally liable for patent infringement—so long as the officers were personally involved in the infringing conduct at issue. *See, e.g.*, *Symbol Techs., Inc.*, 771 F. Supp. at 1402-03; *Daimler AG v. A-Z Wheels LLC*, 334 F. Supp. 3d 1087, 1106-07 (S.D. Cal. 2018); *Rain Gutter Pros, LLC v. MGP Mfg., LLC*, No. C14-0458 RSM, 2015 WL 6030678, at *3 (W.D. Wash. Oct. 15, 2015); *AllTech Commc'ns, LLC v. TelWorx Commc'ns, LLC*, Nos. 08-CV-210-TCK-FHM, 09-CV-276-TCK, 2010 WL 3732150, at *3-4 (N.D. Okla. Sept. 20, 2010).

patentee ("Lubby") had sued, *inter alia*, an individual defendant ("Mr. Chung") for patent infringement. 11 F.4th at 1357 & n.1. Following trial, the jury returned a verdict finding Mr. Chung liable for direct infringement of the asserted patent, and the district court denied Mr. Chung's post-trial motions. *Id.* at 1357-58. Mr. Chung appealed; one of his arguments was that he could not be liable for infringement based on acts that he took on behalf of his company "unless Lubby established that it was appropriate to pierce the corporate veil"—and that Lubby had presented no such evidence. *Id.* at 1358.

The Federal Circuit rejected that argument, stating clearly that "that is not the standard" and reiterating that "[c]orporate officers can be personally liable for their own acts of infringement, even if those acts were committed in their corporate capacity." *Id.* As for Mr. Chung, the Federal Circuit held that the fact that he "may have acted on behalf of his corporation does not excuse him from individual liability"—even though there was no evidence in the record to support piercing the corporate veil. *Id.* at 1358-59. The Court concluded that there was record evidence to support the jury's verdict that Mr. Chung was liable for direct infringement, in light of testimony that he designed the accused products and sold them through his company. *Id.* at 1358. As for the role of the corporate veil in direct infringement inquiries involving corporate officers/owners, the *Lubby Holdings* Court explained that the "rule [is] that a corporate officer—or perhaps only a corporate owner—cannot be found derivatively liable *for the corporation's infringement* without piercing the corporate veil." *Id.* (quoting *Glob. Traffic Techs. LLC v. Morgan*, 620 F. App'x 895, 908 n.6 (Fed. Cir. 2015)). Following *Lubby Holdings*, then, it seems clear that a corporate officer *can* be personally liable for direct infringement, even if the officer

_____

The parties here did not cite to *Lubby Holdings* in their briefing, (D.I. 45; D.I. 49; D.I. 53), but unless the Court is missing something, the opinion is key to understanding what is the right outcome here.

performed those acts while acting in his or her corporate capacity (e.g., while doing work on behalf of the corporation).[10]  In arguing to the contrary—i.e., that a patentee pleading direct infringement against a corporate officer must plausibly allege that the corporate veil has been pierced—Defendants do not acknowledge cases like *Lubby Holdings*.  (D.I. 45 at 6-7; D.I. 53 at 1-2)  And that is fatal to their argument.

### b.    The FAC's Allegations

With that now settled, the Court turns to Duvall's assertion that the FAC sufficiently pleads that Mr. Pendas personally engaged in infringement of the asserted patents.  (D.I. 49 at 4-5)  In support, (*id.*), Duvall points to the following allegations:

- Mr. Pendas was and is the sole owner, founder and Chief Executive Officer ("CEO") of Meticulous.  (D.I. 43 at ¶¶ 7, 34);

- Mr. Pendas is the only owner, controlling officer, decision maker, and/or operator of Meticulous and the Meticulous Website.  (*Id.* at ¶ 17);

- Mr. Pendas has "directly or indirectly filed and/or authorized corporate filings for Meticulous[.]"  (*Id.* at ¶ 8);

---

[10]        In view of *Lubby Holdings*, a host of district courts have concluded the same. *See, e.g.*, *Resh, Inc. v. Conrad*, Case No. 22-cv-01427-EJD, 2024 WL 4177944, at *9 (N.D. Cal. Sept. 11, 2024) (relying on *Lubby Holdings* to reject the assertion that to plead a corporate officer's liability for direct infringement, the patentee "must sufficiently allege that Conrad Sr. committed an infringing act outside of his role as a corporate officer of RCI"); *Pso-Rite.com LLC v. Thrival LLC*, Civil Action No. 21-cv-00775-PAB-STV, 2024 WL 115124, at *7-8 (D. Colo. Jan. 10, 2024) (noting that "recent cases from the Federal Circuit . . . have held individuals liable for direct patent infringement even if their tortious acts were committed as corporate officers" without piercing the corporate veil); *Irritec USA, Inc. v. Valplastic USA, LLC*, Case No. 5:22-cv-00660-AB-SHK, 2023 WL 2626961, at *5 (C.D. Cal. Jan. 4, 2023) ("It follows [from *Lubby Holdings*] that Mr. Kundu could be found liable of any form of patent infringement so long as he personally participated in the infringing conduct."); *BTL Indus., Inc. v. Rejuva Fresh LLC*, No. 1:23-cv-00032-LEW, 2023 WL 6878616, at *3 (D. Me. Oct. 18, 2023) (rejecting the individual defendant's argument that the direct and indirect infringement claims against her must be dismissed because plaintiff did not plead grounds to pierce the corporate veil, because a corporate officer who directs, controls, ratifies, participates in or is the moving force behind infringing activity is personally liable for such infringement, without the need to pierce the corporate veil).

- Mr. Pendas is believed to be the creator and in control of the content of the Indiegogo and Kickstarter Websites. (*Id.* at ¶¶ 20, 25);

- Mr. Pendas was "personally" advertising and marketing the accused products to prospective customers at the SCA in April 2023. (*Id.* at ¶ 29);

- On December 11, 2023, Meticulous filed a certificate of interested persons for this lawsuit indicating that only Meticulous and Mr. Pendas would have an interest in a party to the action. (*Id.* at ¶ 35)

Taking all of the FAC's allegations together, Plaintiff has plausibly alleged not only that Mr. Pendas was the CEO, sole owner and decision maker of Meticulous, but also that: (1) he was the creator and controller of the above-referenced websites that advertised pre-orders of the accused products, (*see id.* at ¶¶ 19, 22-23, 26); and (2) he personally advertised the accused products at the SCA. It certainly seems plausible that Mr. Pendas, Meticulous' only operator and decisionmaker, is the person who ran the Meticulous-related websites that allegedly offered the accused products for sale. And it also seems plausible that Mr. Pendas was at a convention where he was trying to sell those products to potential consumers—especially if Mr. Duvall is said to have seen him there doing just that. So these allegations—i.e., those asserting that Mr. Pendas personally participated in infringing conduct—are sufficient to establish a basis for Mr. Pendas to face suit for patent infringement. *See Resh, Inc. v. Conrad*, Case No. 22-cv-01427-EJD, 2024 WL 4177944, at *8-9 (N.D. Cal. Sept. 11, 2024) (finding that the complaint plausibly pleaded direct infringement against the individual defendant Conrad Sr., where it pleaded that he designed and made the infringing poles and personally appeared at events including expos and trade shows to promote, offer for sale and sell the infringing poles); *BTL Indus., Inc. v. Rejuva Fresh LLC*, No. 1:23-cv-00032-LEW, 2023 WL 6878616, at *2-3 (D. Me. Oct. 18, 2023) (finding that the complaint stated plausible claims of direct and indirect infringement against the

sole member ("Jacobs") of the corporate entity ("Rejuva Fresh LLC"), where the pleading alleged that Jacobs was the moving, conscious and active force behind Rejuva Fresh's infringing conduct—i.e., as its sole owner and officer who participated directly in responding to customer concerns and exercised sole authority over wholesale purchases, the importation of the accused products and the design and content of promotional materials); *Rain Gutter Pros, LLC v. MGP Mfg., LLC*, No. C14-0458 RSM, 2015 WL 6030678, at *1-3 (W.D. Wash. Oct. 15, 2015) (granting a motion to amend a pleading to add a counterclaim of direct infringement against individuals Benjamin Hawes and Kyle Hawes, the controlling officers of the corporate entity ("RGP"), where the allegations demonstrated that they were the founders and owners of RGP and personally directed the infringing activity by controlling the design, development, marketing and sales of the accused products, including by bidding jobs for the sale and installation of the accused products).[11]

---

[11]    That said, the Court does not agree with Duvall that it sufficiently pleaded that Mr. Pendas is merely an alter ego of Meticulous. (*See* D.I. 49 at 4-5)  Because the corporate form is typically respected, piercing the corporate veil is an "extraordinary remedy." *Round Rock Rsch. LLC v. ASUSTeK Comput. Inc.*, 967 F. Supp. 2d 969, 978 (D. Del. 2013) (internal quotation marks and citation omitted).  The United States Court of Appeals for the Third Circuit has held that the corporate veil may be pierced pursuant to the alter ego theory:  (1) when a court finds that there is a fundamental lack of corporate separateness between the entities; and (2) where this situation also presents an element of either fraud, injustice, or unfairness in the use of the corporate form.  *See Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003); *Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*, C.A. No. 17-374-LPS (CONSOLIDATED), C.A. No. 17-379-LPS, 2018 WL 5109836, at *4 (D. Del. Oct. 18, 2018).  In the end, in order to succeed on an alter ego theory of liability, a plaintiff must establish that in all aspects of the business, the relevant actors "actually functioned as a single entity and should be treated as such." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001).

The FAC does not even use the term "alter ego[,]" let alone address the factors established by the Third Circuit that help to demonstrate a lack of corporate separateness (and thus, alter ego liability).  (*See* D.I. 53 at 2)  Duvall cites to no caselaw supporting the idea that simply being the sole owner and officer of a company, making filings and creating websites on behalf of that company, and advertising and marketing the company's products at a conference

Defendants suggest (citing in significant part to a prior declaration of Mr. Pendas) that even if piercing the corporate veil is not required to hold Mr. Pendas personally liable for direct infringement, the FAC's allegations are still insufficient, because Mr. Pendas is a resident of Mexico and the work designing the accused products was done in Mexico. (D.I. 45 at 8 (citing D.I. 16-1)) But this seems to ignore: (1) the FAC's allegations that, for example, Mr. Pendas personally advertised and marketed the accused products to prospective customers at the SCA in the United States, and that he controls websites that allow pre-orders of the accused product in U.S. dollars (offering a discount of 32% off the sales price of the products), (D.I. 43 at ¶¶ 11, 19-27, 29); (2) Section 271(a) states that liability for direct infringement does not require making or selling the accused product in the United States, 35 U.S.C. § 271(a) ("whoever without authority makes, *uses, offers to sell*, or sells any patented invention, *within the United States* or imports into the United States any patented invention during the term of the patent therefor, *infringes the*

---

plausibly indicates that the officer is the alter ego of the company. *See Unicorn Glob., Inc. v. Golabs, Inc.*, Civil Action No. 3:20-CV-02023-N, 2021 WL 4711149, at *1 (N.D. Tex. July 14, 2021) (holding that the complaint's allegations that an individual defendant was the CEO of the defendant and was personally involved with the making and selling of the infringing products did not plausibly establish alter ego liability); *cf. Sierra v. Trafigura Trading LLC*, Civil Action No. 22-366-JLH-CJB Consolidated, 2024 WL 3823018, at *12 (D. Del. Aug. 14, 2024) (concluding, as part of a general jurisdiction inquiry, that the plaintiffs failed to make out a case for alter ego liability, where their "pleading and associated evidence do not well address most or all of [the alter ego corporate separateness] factors"). However, because the allegations otherwise plausibly plead Mr. Pendas' personal involvement in the direct infringement at issue, this deficiency is not fatal to Duvall's claims against Mr. Pendas. *See Rain Gutter Pros, LLC*, 2015 WL 6030678, at *3 ("Given these allegations [establishing individuals' personal involvement in infringement], there is no requirement that [d]efendant allege facts [in its counterclaim] regarding piercing the corporate veil."); *Symbol Techs., Inc.*, 771 F. Supp at 1403 n.11 ("The above discussion does not mean to imply that piercing the corporate veil is not a sufficient means of holding one liable for direct infringement but merely that piercing the corporate veil is not necessary for such a finding."); *see also Resh, Inc.*, 2024 WL 4177944, at *4, *8-9 (concluding that while the plaintiff failed to allege sufficient facts that a corporate entity was the individual defendant's alter ego, the plaintiff asserted facts sufficient to demonstrate that the individual defendant was personally liable for direct infringement).

*patent*") (emphasis added); and (3) that the Court cannot take into account the content of an extra-complaint declaration filed by Mr. Pendas when resolving a Rule 12(b)(6) issue like this one, *see Seakeeper Inc. v. Dometic Corp.*, No. 1:25-cv-00484, 2025 WL 3268279, at *1 n.1 (D. Del. Nov. 24, 2025).[12]

For these reasons, the Court denies the portion of the Motion arguing that Duvall fails to state a claim of direct infringement against Mr. Pendas under Rule 12(b)(6).

### 2.    Does the FAC Establish Personal Jurisdiction Over Mr. Pendas in Delaware?

Defendants' next attack is that the claims against Mr. Pendas, a resident of Mexico, should be dismissed because Duvall has failed to establish personal jurisdiction over him in Delaware. (D.I. 45 at 9-10; D.I. 53 at 2-4; *see also* D.I. 16, ex. 1 at ¶ 2) As was previously noted above, in the face of this challenge to personal jurisdiction, the Court must assess whether Duvall has made a *prima facie* showing that Mr. Pendas' actions fall within the scope of Delaware's long-arm statute and comport with due process.

Duvall asserts that the Court has personal jurisdiction over Mr. Pendas pursuant to subsections (c)(1)-(4) of the Delaware long-arm statute. (D.I. 49 at 5) Delaware's long-arm statute, Del. Code Ann. tit. 10, § 3104(c), in pertinent part reads as follows:

> (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
>
> (1) Transacts any business or performs any character of work or service in the State;
>
> (2) Contracts to supply services or things in this State;

---

[12]    Defendants' related argument that the FAC fails to state claims against both Defendants because Duvall does not identify any act of infringement under Section 271(a) will be discussed in more detail below.

(3) Causes tortious injury in the State by an act or omission in this State; [or]

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State[.]

Del Code Ann. tit. 10, § 3104(c).[13]  Delaware's long-arm statute "is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause." *Hercules Inc. v. Leu Tr. & Banking (Bah.) Ltd.*, 611 A.2d 476, 480 (Del. 1992).

The Court agrees with Duvall that at least subsection (c)(1) ("Subsection (c)(1)") of the Delaware long-arm statute confers personal jurisdiction over Mr. Pendas in this case.  The FAC alleges that Mr. Pendas transacts business in Delaware as the sole owner of Meticulous (a Delaware corporation), which (through the direction and actions of Mr. Pendas) has marketed and secured pre-orders for the accused products around the world, including in Delaware.  (D.I. 43 at ¶¶ 6-9)[14]

Defendants respond that the FAC simply recites unsupported conclusions in this regard—i.e., that the FAC doesn't identify plausible facts indicating that Mr. Pendas has actually engaged in conduct that would subject him to personal jurisdiction in Delaware.  (D.I. 53 at 3-4)  This

---

[13]    Subsections (c)(1)-(3) are specific jurisdiction provisions; specific jurisdiction may be established if the cause of action arises from contacts with the forum.  *Monsanto Co. v. Syngenta Seeds, Inc.*, 443 F. Supp. 2d 636, 643 (D. Del. 2006).  Subsection (c)(4) is a general jurisdiction provision, which requires a greater extent of contacts, but provides jurisdiction even when the claim is unrelated to the forum contacts.  *Id.*

[14]    Defendants argue that Duvall's FAC did not plead jurisdiction under the Delaware long-arm statute.  (D.I. 53 at 2-3; *see also* D.I. 45 at 9)  It is true that the FAC does not expressly reference the Delaware long-arm statute.  (*See* D.I. 43)  But that is not fatal to Duvall's claims against Mr. Pendas here, because as noted above, Rule 8 does not include a requirement "of a statement setting forth the grounds upon which the court has personal jurisdiction over the defendant." *Hansen*, 163 F.R.D. at 474.

19

argument is not persuasive because the FAC alleges several facts demonstrating that Mr. Pendas has engaged in the conduct at issue.

For example, the FAC pleads that in connection with the Statement of Use for the Meticulous mark, Defendants attached pictures of the accused products in shipping boxes and other displays which shows that they were "actually being used in federal commerce[.]" (D.I. 43 at ¶ 13) Relatedly, the FAC also alleges that in the Statement of Use, Mr. Pendas attested that the Meticulous mark was used in federal commerce with respect to the accused products by February 2023. (*Id.* at ¶ 14) And the FAC makes other allegations that not only solidify the inference that Meticulous has offered the accused products for sale, but that it has done so throughout the United States (and that it is likely that this has included offers for sale involving pre-orders made in Delaware): (1) Meticulous sells the accused products through several interactive websites, with at least the Kickstarter Website stating that the accused products can be shipped anywhere in the world; (2) Mr. Pendas owns, controls and operates the Meticulous Website, and creates and controls the contents relating to the accused products on the Indiegogo and Kickstarter Websites; (3) the Meticulous Website provides a Delaware phone number and address if customers would like to contact Defendants; (4) Defendants have raised money (totaling more than 10 million dollars) through these websites by backers, with at least one such backer believed to be located in Delaware; (5) the Kickstarter and Indiegogo Websites enable users to pre-order the accused products and at least a portion of the funds received are believed to be from customers in Delaware; and (6) the Indiegogo Website states that the accused products have been advertised by several third parties believed to market and advertise to consumers in Delaware. (*Id.* at ¶¶ 16-28)

In light of the above, it makes sense that among the millions of dollars of pre-orders of Defendants' products were some from customers in the State of Delaware.  And so the above amounts to plausible allegations that Mr. Pendas transacted business or performed work or services in Delaware that is related to the claims at issue in this case, satisfying Subsection (c)(1).  *See, e.g.*, *Westpark Elecs. LLC v. EDealer LLC*, Case No. 22cv4327 (EP) (JSA), 2023 WL 5321053, at *3-6 (D.N.J. Aug. 17, 2023) (finding that an individual defendant who was the owner and manager of the corporate entity ("EDealer") that controlled, authorized and approved EDealer's conduct, had purposefully directed activities at New Jersey where, *inter alia*, the accused products were sold on Amazon, a third-party website, which reflected a decision to participate in and profit from a worldwide market); *Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd*., Civil Action No. 15-634-SLR-SRF, 2016 WL 4413140, at *5 (D. Del. Aug. 17, 2016) (finding that the record indicated that two defendants made direct sales of the accused products to Delaware customers through their websites, and that this was sufficient to satisfy Subsection (c)(1)), *report and recommendation adopted,* 2016 WL 5723653 (D. Del. Sept. 29, 2016).[15]

Defendants then briefly retort (i.e., in only one sentence in their reply brief) that these allegations do not expose Mr. Pendas to the Court's personal jurisdiction because the conduct at issue is protected under the fiduciary shield doctrine.  (D.I. 53 at 3)  "The fiduciary shield doctrine is a judicially created doctrine that immunizes acts performed by an individual in the

---

[15]    The Court also concludes that exercising jurisdiction over Mr. Pendas would comport with due process.  By incorporating his company in Delaware, directing consumers to contact Defendants through a Delaware phone number or Delaware address on the Meticulous website, and raising funds from at least one backer believed to be in Delaware, Mr. Pendas should have had fair warning that he could be haled into court here.  *See, e.g.*, *Westpark Elecs. LLC*, 2023 WL 5321053, at *5-6.

individual's capacity as a corporate employee from serving as the foundation for the exercise of personal jurisdiction over that individual." *Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 433-34 (D. Del. 1999).

As explained above, Duvall is not alleging that Mr. Pendas is liable for infringement committed by Meticulous; instead, it alleges that Mr. Pendas himself is also personally liable for a tort: i.e., patent infringement. And there are many reasons why the Court declines to find that the fiduciary shield doctrine would protect Mr. Pendas from being subject to personal jurisdiction in this patent infringement suit. For one thing, to the extent Delaware law is relevant here, there is real doubt as to whether Delaware would even recognize the fiduciary shield doctrine in this context. *See Mobil Oil Corp. v. Advanced Env't Recycling Techs., Inc.*, 833 F. Supp. 437, 443 (D. Del. 1993) (concluding that "the Supreme Court of Delaware would not recognize the fiduciary shield as an absolute bar to personal jurisdiction over a corporate employee"); *CH Assocs. XI, LLC v. 1102 W. St., LP*, C.A. No. N24C-09-260 FWW, 2025 WL 671767, at *3-4 (Del. Super. Ct. Mar. 3, 2025) ("When viewed from the forgoing perspective, there appears to be very little support for the fiduciary shield doctrine. If it is not dead, it is at best on life support. Certainly its status as 'good law' is in considerable doubt. Accordingly, the Court approaches the issue of whether Delaware has personal jurisdiction over Ciccone from the perspective of the legislatively created long-arm statute rather than the judicially created fiduciary shield doctrine.") (reviewing caselaw). Additionally, other judicial opinions state that the doctrine is not applicable with regard to the personal jurisdiction inquiry in a matter where (as here) a defendant is alleged to have committed an intentional tort. *See, e.g., Auto Wax Co. v. Marchese*, No. CIV.A. 301CV2571M, 2002 WL 1558376, at *3 (N.D. Tex. July 15, 2002) (noting this principle in a patent litigation matter); *Glob. 360, Inc. v. Spittin' Image Software,*

*Inc.*, No. CIV.A3:04-CV-1857-L, 2005 WL 625493, at *7 (N.D. Tex. Mar. 17, 2005) (same). Moreover, in at least one opinion, the Federal Circuit (albeit without making explicit reference to the name of the doctrine) has seemed to reject the concept that the fiduciary shield doctrine could apply in a situation like this. *See Campbell Pet Co. v. Miale,* 542 F.3d 879, 889 (Fed. Cir. 2008) (rejecting the defendants' argument that an individual defendant's conduct at a convention in the forum state could not serve as the basis for exercising personal jurisdiction over her because she was "acting in her official capacity" as company president and not in her "personal capacity[,]" and noting that the argument was "without merit"); *Dehn's Innovations LLC v. Total Imp. Sols., Inc.*, Civil Action No. 3:11-CV-3042-N, 2012 WL 13019681, at *6 (N.D. Tex. Aug. 29, 2012) (citing *Campbell* for the proposition that the Federal Circuit "does not apply [the fiduciary shield doctrine]"); *UATP IP, LLC v. Kangaroo, LLC*, Civil Action H-21-2478, 2022 WL 1644592, at *1 & n.4 (S.D. Tex. May 24, 2022) (same, and stating that "[b]ecause this case arises under a patent claim, the doctrine is inapplicable")); *but see Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1347 (Fed. Cir. 2012). Lastly, many other courts have done the same.[16] In the end, for the reasons set out above, the Court will not apply the doctrine in this circumstance.

---

[16]    *See POWERbahn, LLC v. Found. Fitness LLC*, CIVIL ACTION NO. 1:17-cv-2965-AT, 1:19-cv-1678-AT, 2020 WL 1467248, at *8 (N.D. Ga. Jan. 29, 2020) (explaining that "the fiduciary shield doctrine does not insulate Mr. Warner from this Court's exercise of personal jurisdiction[,]" where the plaintiff alleged that "Mr. Warner himself committed an intentional tort through his contacts with Georgia"); *ProSource Discounts, Inc. v. Dye*, Case No. 2:19-cv-00489-AB-JC, 2019 WL 6729702, at *3-4 (C.D. Cal. July 23, 2019) (rejecting the defendant's argument that under the fiduciary shield doctrine, his conduct did not expose him to personal jurisdiction in California because his conduct was in his capacity as a corporate officer, and calling this argument a "red herring, because [the defendant] can be held liable for tortious conduct even in his official capacity if he was the moving force behind the corporation's tortious conduct"); *see also Airhawk Int'l, LLC v. Air Seat Innovations LLC*, Case No. 3:23-cv-1068-AGS-BLM, 2024 WL 4048863, at *4 (S.D. Cal. Sept. 4, 2024) (noting that a corporate officer's contacts on behalf of a corporation can be sufficient to subject the officer to personal jurisdiction, where the officer is a primary participant in the alleged wrongdoing or controlled the alleged activities—and doing so in response to defendant's argument that his acts in an official capacity

For these reasons, the FAC plausibly pleads that Mr. Pendas is subject to this Court's personal jurisdiction.  Defendants' Motion in this regard is therefore denied.

**B.    Sufficient Allegations of Infringement and Rule 12(b)(6)**

The Court now turns to Defendants' various arguments about the sufficiency of Duvall's claims against both Defendants.

**1.    Acts of Direct Infringement**

Defendants first argue that the FAC fails to plead direct infringement claims against both Defendants because they have not commercially launched a product anywhere in the world. (D.I. 45 at 10-13; D.I. 53 at 4-7)  But a reading of Section 271(a) easily establishes that this fact is not necessarily fatal to Duvall's direct infringement claims.

That's because, as Duvall retorts, a finding of direct infringement does not require actual sales.  (D.I. 49 at 8-9)  Rather, as the Court previously noted above, Section 271(a) also provides that making, using, or offering to sell any patented invention within the United States, or importing into the United States any patented invention, constitutes infringement.  35 U.S.C. § 271(a); *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1573 (Fed. Cir. 1996) ("The patent statute grants the patentee the right to exclude others from making, using, *or* selling the patented subject matter. . . .  Any of these activities during the patent term is an infringement of the patent right.") (emphasis added); *FutureLogic, Inc. v. TransAct Techs. Inc.*, Case No. CV 05-3754 MMM (CTx), 2007 WL 9700730, at *15 (C.D. Cal. Aug. 2, 2007) ("Even if these prototypes have never been offered for sale, the mere 'making' of an infringing device is actionable under 35 U.S.C. § 271.").

---

for corporate entity cannot be attributable to him as individual acts creating personal jurisdiction).

As the Court has already set out, the FAC sufficiently alleges the commission of non-sale infringing acts.  (D.I. 49 at 9)  For example, the FAC alleges that customers can pre-order the accused products on the Indiegogo Website and the Kickstarter Websites.  (D.I. 43 at ¶¶ 19, 26)  And with respect to these pre-orders, the FAC also alleges that:  (1) the Kickstarter Website states that Meticulous ships anywhere in the world; (2) customers that pre-order the accused products receive at least 32% off of the sales price of $2,000 for each of the accused products; (3) after a customer pre-orders an accused product from the Indiegogo website, it is later shipped to the customer; (4) Defendants have collected over 10 million dollars in association with these pre-orders; and (5) the Kickstarter Website stated that, as of May 2023, the accused products were expected to ship to consumers in December 2023.  (*Id.* at ¶¶ 16-23, 25-27)

An offer for sale under Section 271(a) "requires no more than a commercial offer for sale."  *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1254 (Fed. Cir. 2000).  The policy underlying imposing liability for offers to sell under Section 271(a) includes "preventing a competitor from generating interest[] in a potential infringing product to the commercial detriment of the rightful patentee."  *Id.* at 1255 n.3; *see also 3D Sys., Inc. v. Aarotech Lab'ys, Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998).  The FAC's allegations—stating that Defendants amassed over 10 million dollars in pre-orders of their products, which were offered by Defendants for a particular (discounted) sales price, and as to which (at least at times) Defendants referenced a then-expected shipping date—plausibly allege that Defendants were offering the accused products for sale.[17]  *See, e.g.*, *3D Sys., Inc.*, 160 F.3d at 1378-79

---

[17]    Defendants argue that Duvall did not allege an offer for sale as an act of infringement in the FAC.  (D.I. 53 at 5)  It is true that the FAC alleges that Defendants have directly infringed by "*at least*, selling, manufacturing, using, importing, and marketing the" accused products without specifically also using the words "offering for sale."  (D.I. 43 at ¶¶ 62, 70, 78)  But the notice letter attached to the FAC states that Defendants are "offering for sale"

(concluding that price quotation letters were offers for sale under Section 271(a), despite the fact that the letters stated on their face that they were not offers, where the letters also contained a "description of the allegedly infringing merchandise and the price at which it can be purchased" and thus "generat[ed] interest in a potential infringing product to the commercial detriment of the rightful patentee"); *Sitrick v. Freehand Sys., Inc.*, No. 02 C 1568, 2002 WL 31443128, *1, *4-5 (N.D. Ill. Oct. 30, 2002) (finding that the defendant's conduct constituted an "offer to sell" under Section 271(a), where "the brochures that Hamilton personally gave to a member of the Chicago Lyric Opera while in Illinois contained a detailed description of the accused device and its purchase price[,]" and where interested persons would "reserve" units by placing a reservation, providing credit card or check information and receiving an estimated shipping date—even though the accused product was then under development and not in full-scale production).

In arguing to the contrary, Defendants point out that the Kickstarter and Indiegogo Websites both state that backing a product is not the same as "buying an existing item in a store and as such receiving a reward in return for pledging is not guaranteed" and that the "machine is not yet ready for mass production." (D.I. 45 at 10-11 (citing D.I. 41, ex. 1 at 5, ex. 2 at 4, ex. 3 at 1, ex. 4); *see also* D.I. 53 at 7) But the force of this argument is blunted by the two cases the Court has cited above. In *3D Sys., Inc. v. Aarotech Lab'ys, Inc.*, 160 F.3d 1373 (Fed. Cir. 1998), the Federal Circuit found that to treat price quotation letters as anything other than offers to sell—even despite the fact that the letters stated on their face that they were not offers for sale— "would be to exalt form over substance." 160 F.3d at 1379; *see also Seakeeper Inc.*, 2025 WL 3268279, at *2. And in *Sitrick v. Freehand Systems, Inc.*, No. 02 C 1568, 2002 WL 31443128,

---

and "possibly selling" the accused products; construing the FAC's allegations in the light most favorable to Duvall, as the Court must at this stage, the Court finds that Duvall sufficiently alleges "offers for sale." (*Id.*, ex. D at 2)

(N.D. Ill. Oct. 30, 2002), the fact that the accused product was not in full-scale production did

not stop the *Sitrick* Court from finding that the brochures at issue constituted offers for sale,

where the defendant allowed interested persons to "reserve" the accused products by providing

financial information through a toll-free number.  2002 WL 31443128, *1, *4-5.  While

Defendants attempt to characterize the accused products as merely "ephemeral ideas of a

product" and not real products, (D.I. 53 at 7), the FAC demonstrates that the accused espresso

machines were far more than an idea.  To that end, the FAC includes:  (1) depictions of the

accused products being displayed and placed in shipping boxes at a conference; and (2)

additional depictions of the products on the Indiegogo and Kickstarter Websites.  (D.I. 43 at ¶¶

13, 21, 25, 51)[18]

    In addition—and after reading the FAC's allegations in the light most favorable to Duvall

and drawing all reasonable inferences in its favor—the Court also finds that the FAC sufficiently

pleads that the accused products were either made in the United States or that Defendants

---

[18]    Defendants cite to *QR Spex, Inc. v. Motorola, Inc.*, 507 F. Supp. 2d 650 (E.D. Tex. 2007) as the only case of which they are aware that addresses whether pre-orders are "offers for sale" that would count under Section 271(a); Defendants state that *QR Spex* found that they are not.  (D.I. 53 at 7)  But whatever the merit of the *QR Spex* Court's conclusion in that regard, the facts of that case are distinguishable.  There, the "terms on [the subject] website surrounding the pre-orders were indefinite and lacked key details such as delivery terms."  507 F. Supp. 2d at 660 (further finding that website inviting pre-orders did not constitute an offer for sale sufficient to create personal jurisdiction in Texas, where there was no evidence that any Texas resident even placed a pre-order).  Here, again, it is alleged that Defendants provided consumers with a specific percentage discount off of a $2,000 sales price, and that the Kickstarter Website at one point informed customers that the accused product "is set to ship in December" 2023.  (D.I. 43 at ¶¶ 22, 27)  There is no indication that the websites otherwise lacked key details.  *See also, e.g.*, *Strategic Operations, Inc. v. Joseph*, Case No.: 17-CV-1539-JLS (NLS), 2018 WL 3833411, at *3 (S.D. Cal. Aug. 13, 2018) (finding that a complaint alleged that a posting was an invitation for offers instead of an offer for sale under Section 271(a), where "[t]here is no information on pricing of the product; instead the post specifically invites the consumer to send an email to request pricing information").  Indeed, here a significant number of pre-orders were in fact allegedly placed, sufficient to raise over 10 million in funds.  (D.I. 43 at ¶¶ 20, 25)

imported them into the United States. (D.I. 49 at 12-13) While the FAC does not expressly allege where the accused products were made, the allegations make clear that Mr. Pendas was advertising and marketing the accused products to prospective customers at the 2023 SCA, which took place in the United States. (D.I. 43 at ¶¶ 13, 29; *see also* D.I. 45 at 12 (Defendants acknowledging that "Meticulous transported a prototype to tradeshows" including the SCA)) And so, as Duvall points out, the fact that Defendants transported and displayed the accused products at tradeshows in the United States "means that those [a]ccused [p]roducts must have either been (a) made in the U.S. directly, or (b) made abroad and imported in the U.S. in time for the tradeshows." (D.I. 49 at 12-13); *Zoltek Corp. v. United States*, 672 F.3d 1309, 1326 (Fed. Cir. 2012) ("Importation occurs when the product crosses the United States' border[.]"); *Largan Precision Co v. Genius Elec. Optical Co.*, 86 F. Supp. 3d 1105, 1114-16 (N.D. Cal. 2015) (finding that a defendant that shipped a small number of product samples into the United States imported those products into the country under the meaning of Section 271(a)).

For these reasons, the Court finds that the FAC plausibly alleges a viable type (i.e., offering for sale, or making/importing) of direct infringement claim against Defendants.[19] This aspect of the Motion is therefore denied.

### 2. Indirect Infringement

Next, Defendants assert that Duvall's indirect infringement claims with respect to all asserted patents should be dismissed. On that score, Defendants argue that the indirect infringement claims are barebones, in that they allege only that Defendants "instructed [their]

---

[19] In light of the Court's conclusions here, it need not address Duvall's assertion that the pleaded facts sufficiently allege "use" of the accused products. (D.I. 49 at 9, 12-13)

customers to utilize the [a]ccused [p]roducts in an infringing manner." (D.I. 45 at 14 (citing D.I. 43 at ¶¶ 64, 72, 80))

The Court easily agrees with Defendants here. For one thing, the FAC isn't even very clear that in it, Duvall is *actually trying* to plead indirect infringement. Each Count, after all, is simply titled "Willful Direct Infringement of [each asserted patent.]" (D.I. 43 at 19-21) And each Count initially states that "[t]his is an action for *direct* patent infringement pursuant to" Section 271(a). (*Id.* at ¶¶ 61, 69, 77 (emphasis added)) Indeed, in the one paragraph per Count that uses the phrase "indirectly infringing[,]" Duvall didn't even explicitly identify which type of indirect infringement is supposed to be at issue. (*See, e.g., id.* at ¶¶ 64, 72, 80); *see also Tonal Sys., Inc. v. ICON Health & Fitness, Inc.*, Civil Action No. 20-1197-LPS, 2021 WL 1785072, at *2 n.2 (D. Del. May 5, 2021) ("A note to patentees bringing claims in our Court: . . . If you are pleading 'induced infringement' or 'contributory infringement' then somewhere in the counts/claims: (1) actually use those words (or variations thereof); (2) make some reference to the elements of those claims; and (3) plead facts relating to those elements."), *report and recommendation adopted*, 2021 WL 5860783 (D. Del. Aug. 12, 2021).

In its answering brief, Duvall clarifies that it intended to plead induced infringement in the FAC. (D.I. 49 at 13) A party asserting a claim of induced infringement must plead facts plausibly demonstrating that there has been direct infringement, and that "the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009).

The FAC does not meet this standard, nor even try very hard to meet it. For one thing, there are no facts pleaded that demonstrate that Defendants' customers (or some other third-party

direct infringer) actually utilized the accused products in an infringing manner. Nor are there any facts pleaded about the instructions provided to customers/third-parties that would demonstrate Defendants' intent to induce infringement. Again, the Counts instead say only that Defendants have "instructed its [sic] consumers to utilize the Accused Products in an infringing manner[.]" (*See, e.g.*, D.I. 43 at ¶ 64) This type of conclusory allegation is fatal to Duvall's induced infringement claims. *See, e.g.*, *Cleveland Med. Devices Inc. v. ResMed Inc.*, 696 F. Supp. 3d 4, 13 (D. Del. 2023) ("CleveMed does not explain what ResMed purportedly provides in its 'instructions to customers that resulted in infringing use' . . . —an omission that further discourages this Court to find CleveMed's claims well-pled."); *Bench Walk Lighting LLC v. LG Innotek Co.*, 530 F. Supp. 3d 468, 490-91 (D. Del. 2021) ("Plaintiff's allegations provide Defendants with insufficient notice about what it is they did that amounts to encouragement of infringement of the 10 patents-in-suit. Plaintiff's inducement claims should be dismissed as a result.").

### 3.    Direct Infringement of the '187 and '491 Patents

Defendants' next argument is that the FAC's claims of direct infringement with respect to the '187 and '491 patents fail because the FAC's mapping of the claim elements of these patents to the accused products is "entirely conclusory" and in many instances "directly contradicted by the very materials it cites." (D.I. 45 at 14-15; *see also* D.I. 53 at 8-9)[20]

A complaint sufficiently pleads direct infringement when the allegations provide the defendant with "fair notice of infringement of the asserted patents." *Disc Disease Sols. Inc. v.*

---

[20]    The Court notes that Duvall's answering brief on this issue was entirely unhelpful and very frustrating, as it made no real attempt to engage with the specifics of Defendants' arguments, nor discuss the FAC's allegations as to the particular claim limitations at issue in any meaningful way. (D.I. 49 at 14-16; D.I. 53 at 8 (Defendants noting the same))

*VGH Sols., Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018). At the pleading stage, a plaintiff is not required to prove its case, *Nalco Co. v. Chem-Mod, LLC,* 883 F.3d 1337, 1350 (Fed. Cir. 2018), and "[s]pecific facts are not necessary to support every allegation in the complaint[,]" *AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 39 (Fed. Cir. 2024) (internal quotation marks and citation omitted). Rather, the complaint must contain "some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim." *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1353 (Fed. Cir. 2021). A plaintiff therefore cannot assert a plausible claim for infringement by "reciting the claim elements and merely concluding that the accused product has those elements." *Id.* But a plaintiff need not "plead infringement on an element-by-element basis." *Id.* at 1352. The Federal Circuit has explained that "[t]he level of detail required in any given case will vary depending upon a number of factors, including the complexity of the technology, the materiality of any given element to practicing the asserted claim(s), and the nature of the allegedly infringing device." *Id.* at 1353; *see also AlexSam*, 119 F.4th at 39.[21]

Defendants raise three reasons why Duvall's allegations as to these patents are insufficient to plausibly assert direct infringement of the asserted claims. In the Court's view, one of the three reasons suffices to warrant grant of the Motion in some respect, and so the Court will take that reason up first.

All of the asserted claims of the '491 patent and claim 1 of the '187 patent require the claimed system to "modulate and maintain the flow of the solvent . . . without the use of a

---

[21]    The law of the Federal Circuit applies to the question of whether a complaint states a plausible claim of patent infringement. *AlexSam*, 119 F.4th at 35.

feedback mechanism for monitoring the flow of the solvent." (D.I. 43 at ¶¶ 53, 56)[22] The FAC facially alleges that the accused products are configured in such a way (i.e., via their pump/piston configuration) to change or maintain a flow of solvent without using a feedback mechanism like a sensor. (*Id.* at ¶¶ 52-53, 55-56) Yet the images of the accused products in the FAC indicate that the products include "10 digital sensors[.]" (*Id.* at ¶¶ 53, 56) And the Kickstarter and Indiegogo Websites explain that these digital sensors "monitor every variable during extraction, including . . . flow rate" and that a "scale works with the flow sensor to know exactly how much water is going through the coffee and into the cup, adjusting its flow and stopping the shot for exactly the right brew ratio." (D.I. 46, ex. 1 at 4-5, ex. 2 at 4-5)[23] On its face, then, this content seems to contradict the idea that the claimed system modulates or maintains "the flow of the solvent . . . without the use of a feedback mechanism for monitoring the flow of the solvent." And the FAC's allegations do nothing to help explain *how or why* it is the case that the system's pump monitors the flow of the solvent without the use of a sensor, (*see, e.g.*, D.I. 43 at ¶¶ 53 (bottom right figure), 56 (bottom right figure)), in light of the fact that the system has 10 digital sensors that monitor the flow of the solvent, (*see* D.I. 49 at 14-16). For these reasons, the FAC's allegations do not plausibly state direct infringement of claim 1 of the '187 patent and the asserted claims of the '491 patents. *See, e.g.*, *Bot M8 LLC*, 4 F.4th at 1354 (agreeing with the district court that the plaintiff had failed to provide factual allegations supporting a plausible

---

[22]    Asserted claims 8 and 16 of the '187 patent do not include this limitation, so this argument doesn't apply to these claims. (D.I. 43 at ¶ 54; *id.*, ex. B at col. 18:15-31, cols. 19:16-20:8)

[23]    In its opening brief, Defendants assert that these webpages may be considered by the Court because Duvall cites them in the FAC in order to make out its claims. (D.I. 45 at 11 n.5 (citing cases)) Duvall does not dispute this in its answering brief. (D.I. 49 at 14-16)

inference of infringement, where the claim required that a game program and authentication program be stored together separate from the motherboard, but the complaint pleaded that the authentication program of the accused product was located on the motherboard itself); *cf. Champion Power Equip., Inc. v. Generac Power Sys., Inc.*, 764 F. Supp. 3d 773, 778 (E.D. Wis. 2025) ("In a case like this, more details about how the accused product embodies the claim language would be needed only if there were an apparent contradiction between the claims and what the complaint alleges about the accused product.  For example, if the patents appeared to claim pressure washers, more details would be needed to explain how an accused portable generator plausibly satisfies the claim language.").[24]

The Court is not persuaded that Defendants' other two reasons for dismissal demonstrate why the FAC's allegations of direct infringement of the '187 and '491 patents are implausible.  It takes up those two reasons below.

Defendants' second reason for dismissal is that Duvall's allegations are "internally inconsistent" because:  (1) the '774 patent has a limitation requiring a heating element "outside of fluid contact with the solvent" (the "outside of fluid contact" limitation); (2) in the FAC, Duvall points to the accused product's temperature control functionality as meeting this limitation; and yet (3) the '491 patent has a limitation requiring a temperature modulation system be "in fluid communication with the solvent flow management system" (the "in fluid communication" limitation); and (4) Duvall also points to this *same* functionality (i.e., the temperature control functionality) as meeting the in fluid communication limitation.  (D.I. 45 at 17 (citing D.I. 43 at

---

[24]    The Court is not saying that Duvall could never plead a plausible claim in light of this issue.  It is just saying that the FAC's broad allegations appear to be contradicted by the clear assertions in the record stating that the accused products contain sensors that monitor the flow of the solvent—and so the claim *as currently pleaded* is not plausible.

¶¶ 51, 56); D.I. 53 at 8)  Defendants say this is problematic because Duvall "does not explain how the same component can be both *outside* of fluid contact for purposes of the '774 patent, and *in* fluid communication for purposes of the '491 patent."  (D.I. 45 at 17)

But the Court does not understand why a component being outside of fluid contact with the *solvent* (such as water) is irreconcilable with the idea of that component being in fluid communication with the solvent flow management *system*.  In other words, it seems possible to the Court that a component can be *outside* of contact with the *water* but still *in* communication with the *system* as a whole.[25]  This particular argument seems one better suited for claim construction than the pleading stage.  *See, e.g.*, *Woodstream Corp. v. Bird Buddy, Inc.*, No. 1:24-cv-01236, 2025 WL 2432506, at *3-4 (D. Del. Aug. 22, 2025).

Defendants' third reason for dismissal is that:  (1) the FAC fails to show how the accused product meets the claim limitation in the '187 and '491 patents that requires the solvent flow management system to "at least one of modulate and maintain a flow of the solvent independent of a back pressure[;]" within a brewing chamber; since (2) for this limitation, the FAC just points to a pump/piston, without explaining how the pump can operate "independent of a back pressure."  (D.I. 45 at 16-17 (citing D.I. 43 at 16, 18); D.I. 53 at 8)  Defendants assert that the accused product "has a fundamentally different structure than what the patent describes to achieve this result[.]"  (D.I. 45 at 16)

In the Court's view, Defendants are asking too much at this early stage of the litigation. In describing the invention, the FAC alleges that the claimed infused beverage brewing assembly

---

[25]     Moreover, it appears that Duvall is pointing to different components as satisfying these limitations.  (D.I. 43 at ¶ 51 (pointing to a heating element within the pump body for the outside of fluid contact limitation); *id.* at ¶ 56 (pointing to different component as the solvent temperature management system that would satisfy the in fluid communication limitation))

includes a solvent flow management system configured to "*change or maintain* a flow of solvent (e.g., water) through the brewing chamber where the ground beans (i.e., solute) are housed[,] independent of a back pressure within a brewing chamber[.]"  (D.I. 43 at ¶¶ 52, 55 (emphasis added))  Defendants acknowledge that Duvall points to the pump/piston for this limitation.  And it seems plausible to the Court that the pump at issue could have this capability (certainly, the text and images of the FAC do not seem to facially contradict this assertion).  In the end, it is just not clear to the Court, at this stage, how such a component would be unable to satisfy the limitation in question.[26]  *Woodstream Corp.*, 2025 WL 2432506, at *3-4 (rejecting a defendant's argument that the complaint failed to sufficiently plead that the accused products contained the claimed internally mounted camera, where that argument prematurely "ask[s] this court to decide, by only looking at the pleadings, what counts as the 'inside,' whether the camera must be mounted *within* the inside or instead *from* the inside, and other similar questions").

### 4.    Pre-Suit Knowledge of the '187 and '491 Patents

Lastly, Defendants contend that Duvall's willful infringement claims fail for the '187 and '491 patents because the FAC fails to sufficiently plead Defendants' knowledge of these patents.  (D.I. 45 at 18-19)[27]  Willful infringement claims require that the defendant had knowledge of the patents-in-suit and knowledge that the acts at issue constituted patent infringement.  *Bench Walk Lighting LLC*, 530 F. Supp. 3d at 491.

---

[26]    The Court also notes that, at times, Defendants seem to suggest that the claims require the system to both "modulate and maintain" the solvent flow independent of a back pressure, while on their face, the claims require the system to, at minimum, modulate *or* maintain (i.e., in reciting "at least one of").  (D.I. 45 at 16; D.I. 43 at ¶¶ 53, 56)

[27]    Defendants also argue that Duvall's induced infringement claims must be dismissed for this reason, but the Court has already granted dismissal of those claims, as explained above.

The Court agrees that these claims are insufficiently pleaded as to pre-suit knowledge (that is, knowledge prior to the date of filing of the initial Complaint on October 11, 2023) of these two patents.  All that the FAC pleads with regard to Defendants' prior knowledge of the '187 and '491 patents is that:  (1) At the SCA, Mr. Duvall informed Mr. Pendas that the accused products "infringed multiple patents owned by Mr. Duvall[;]" and (2) Duvall's follow up notice letter described how the accused products infringed the '774 patent "and other patents of Mr. Duvall."  (D.I. 43 at ¶¶ 30, 50 & ex. D; *see also* D.I. 49 at 18-19 (Duvall pointing to these two allegations as establishing Defendants' pre-suit knowledge of the '187 and '491 patents))  But there is no allegation that Mr. Duvall specifically mentioned the '187 or '491 patents at the SCA conference.  Moreover, the notice letter at issue is attached as an exhibit to the FAC, and it does not mention the '187 and '491 patents, nor does it allege that those patents are infringed by Defendants' accused products.  (D.I. 43, ex. D; *see also* D.I. 45 at 20)  Indeed, the only specific reference in the letter to Duvall patents or patent applications other than the '774 patent is to three foreign patents (one European patent, one Japanese patent and one Chinese patent).  (D.I. 43, ex. D at 1 n.2)  This does not do the job of plausibly establishing Defendants' pre-suit knowledge of the '187 and '491 patents.  *See, e.g.*, *Bench Walk Lighting LLC*, 530 F. Supp. 3d at 492 & n. 9 (concluding that a notice letter that did not reference two of the asserted patents could not have provided defendants with knowledge of those patents) (citing cases); *see also Hewlett Packard Enter. Co. v. Inspur Grp. Co.*, Case No. 24-cv-02220-JST, 2025 WL 754265, at *26 (N.D. Cal. Mar. 10, 2025) ("Because this letter neither mentioned the asserted patents nor stated that IEIT Systems was infringing the asserted patents, the Court cannot reasonably infer based on this letter that IEIT Systems knew of the asserted patents before this action began.").

That said—at least as to the otherwise surviving claims of infringement regarding claims 8 and 16 of the '187 patent, the FAC sufficiently pleads post-suit knowledge (because Defendants had notice of those patent claims as of the date of receipt of the original Complaint in this case). *See NEC Corp. v. Peloton Interactive, Inc.*, Civil Action No. 22-987-CJB, 2023 WL 8529287, at *3 (D. Del. Dec. 8, 2023) (explaining that a plaintiff can sufficiently plead knowledge of an asserted patent in an amended complaint by pointing back to the notice that the accused infringer received of the patent's existence via a prior complaint filed in the same case).

This portion of Defendants' Motion is therefore granted-in-part and denied-in-part.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS-IN-PART and DENIES-IN-PART the Motion. More specifically, the Court grants the Motion with respect to the indirect infringement claims, and with respect to the direct infringement and willful infringement claims regarding claim 1 of the '187 patent and the asserted claims of the '491 patent. The Court grants these portions of the Motion without prejudice. That is because it seems possible that Duvall might be able to remedy the deficiencies by way of filing a further amended complaint, and Federal Rule of Civil Procedure 15 admonishes that leave to amend should be freely permitted "when justice so requires." Fed. R. Civ. P. 15(a)(2). Plaintiff may file an amended complaint within 14 days.

Otherwise, the Motion is denied as to claims of direct infringement regarding claims 8 and 16 of the '187 patent; it is granted as to claims of pre-suit willful infringement and denied as to claims of post-suit willful infringement as to those claims. The Motion is denied as to all asserted claims of the '774 patent, and is otherwise denied.

An appropriate Order shall issue.